## MARBLE vs. McMINN and others.

Surveys, maps, and field-notes, made by a stranger, without authority or right, cannot be received to alter, contradict or vary a title under a previous deed.

And a deed with its description taken from such a survey or map, ought to have authenticity, to make it evidence.

In the absence of evidence showing his identity, or that he was even a surveyor, or the correctness of his survey, the survey and maps of such person are worse evidence, as against the parties in interest, than even mere hearsay.

A party cannot, as against the true owner, be holding premises adversely, if his title does not cover the premises. He is, in such a case, a mere squatter or trespasser.

Although adverse possession is not affected by a bad or defective title; and although a claim under a defective title will be a good adverse possession; yet there must be at least color of title.

Where one is in possession without claim of right, before the date of his deed, such possession will be presumed to be the possession of the true owner. He can claim to be holding adversely, only after, or at the date of, his deed.

There is nothing in the statute, or common law, that prevents a party claiming title to lands from purchasing in outstanding claims of other persons, to quiet his own title; and the deed, release or quit-claim of the outstanding claim is not void; it will have the effect, at least, to quiet the claim of title of the person executing it.

The taking of such a deed is not an acknowledgment that the grantee has no other title.

THIS was an action brought, in June 1865, by the plaintiff against the defendants, to recover possession of an island situate in the town of Davenport, Delaware county, and State of New York. The plaintiff claimed three acres of land, in his complaint, the same more or less. The defendants, by their answer, 1st. Made a denial; 2d. Alleged that they had acquired the title by adverse possession; 3d. That they held it by virtue of a deed from Philo Andrews and wife to them. By consent, the cause was referred to O. W. Smith, Esq., as sole referee, to hear and determine the action. The cause having been brought to a hearing before said referee, he reported in favor of the defendants. A judgment was entered upon the report, for the defendants, from which the plaintiff has

brought an appeal, and claims a reversal of the judgment, and a new trial, for errors committed by the referee. All further facts, necessary to be considered, are stated in the opinion.

*George Adee*, for the plaintiff.

*A. Raymond Gibbs*, for the defendants.

*By the Court*, POTTER, J. On the trial the plaintiff proved title to the premises in question in one Philemon Harlow, under a lease in perpetuity, with covenants of warranty, from Peter Smith, Wm. Laight and John Jacob Astor, dated September 1st, 1803, which was received in evidence as an ancient deed, describing the premises as follows: " All that farm or piece of land situated and lying in a certain tract known by the name of the Charlotte River Patent, in the county of Delaware, and is more particularly distinguished on a map of said tract, made by Lawrence Vrooman, by being the westerly side or part of lot No. 39, south side of the river, and is bounded northerly by the middle of the river as it winds and turns, westerly by lot No. 40, southerly by the southerly bounds of the patent, and easterly by a line to be drawn through the lot parallel to the westerly line of the same, at such distance therefrom as will make the piece hereby described exact one hundred and twenty acres." This description, as delineated on a diagram produced in evidence, covers the premises claimed in the complaint. This title descended to James Harlow, the son of the lessee above named. James Harlow also claimed to own the premises described in the complaint, parcel of said 120 acres, under a comptroller's deed, which is claimed to be delineated upon another map produced in evidence, and this parcel is described, by witnesses, as an island, lying south of Charlotte river, and between the said river and

a ditch or slang, as it is called, made by erecting a dam in the main channel of the river, and diverting the water through this canal, ditch or slough, to a saw-mill. The plaintiff then, by various mesne conveyances, traces the title to a certain patent called the Charlotte River Patent, and the Byrnes Patent, to Gerrit Smith—excepting certain lands theretofore sold or conveyed—which Charlotte River Patent includes the premises in question. The plaintiff also produced in evidence a quit-claim deed from Gerrit Smith and wife to James Harlow, describing the property as in the deed above set forth, dated 3d May, 1852, and also a deed from James Harlow and wife to himself, dated October 17th, 1864, of premises described as follows: " All that piece or lot of land lying and being in the town of Davenport, being a part of lot No. 39, south side of Charlotte river, Charlotte River Patent, the westerly division of said lot bounded northerly by the middle of said river, westerly by lot No. 40, on the south by a slang or mill ditch, or small stream close to the foot of the hill or bank, and on the east by lands of Thomas Shellman, being an island containing about three acres of land, the same more or less." These are the premises described in the complaint. And there was evidence of possession by Philemon Harlow, and of James Harlow, under this title. When the plaintiff rested, he had established a good paper title and possession under it, and on motion by the defendants, the referee correctly refused to nonsuit.

The defendants then proved a deed, dated January 29, 1847, from Gerrit Smith and wife, to Philo Andrews, of above 275 acres of land on the *north* side of the Charlotte river, containing, by James Frost's survey, made in 1830, the above quantity of land. Frost's map was then offered in evidence, which showed the ditch, canal or slang to be the Charlotte river, and which would be the southern boundary of the premises conveyed. The plaintiff's counsel " objected to this map, that it is improper and imma-

terial, and was made subsequent to Philemon Harlow's lease, from which the plaintiff's grantor derived title; that it cannot be received to alter, contradict or vary said title; and also because made by a stranger, without authority or right." These objections were overruled, and the plaintiff excepted. These objections become greatly important, inasmuch as the defendant claims title, not only, but to identify the premises in his deed under which he claims to hold, through a conveyance from Philo Andrews, by his conveyance dated in 1851. And the referee bases his decision upon the possession of the premises by the defendant, under the deed of Andrews of June 10th, 1851. Now it must be borne in mind that Andrews' deed, that is, the deed to Andrews, does not cover the premises in question, being located north of the Charlotte river. This is so, even by what is called the Frost map, unless this artificial ditch, or slang, can be construed to be the Charlotte river. This would seem to be the theory of the Frost map. This deed, then, with its description taken from such a survey or map, ought to have authenticity, to make it evidence. Who, then, is James Frost? Who proves him even to be a surveyor? Though there is evidence that he did survey, who proves the correctness of his survey? What power has this stranger to change an artificial ditch into a natural river? His acts are worse evidence than even mere hearsay. The whole weight of evidence is, that the river runs where it did fifty years ago, and that this artificial stream was, if not entirely created, at least supplied with water from the natural river, by the construction of a dam therein. Had the grantor in a deed, having at the time the title, bounded lands by an artificial stream, and called it a river, the monument might have been controlling, as against him and his privies in estate; but no stranger, having no interest in lands, can work such a metamorphosis, to the injury of the true owner of title. Neither map nor sur-

vey, unauthenticated, can be the shadow of evidence against parties in interest. As the defense is built upon this deed, supported by such a map, the referee committed a fatal error in admitting this evidence. The defendant could not, as against the true owner, be holding the premises adversely, claiming under title, if his title does not cover the premises. He is, in such case, a mere squatter or trespasser. True, adverse possession is not affected by bad or defective title. A claim of title under defective title will`be a good adverse possession; but there must be at least color of title. So, even possession alone, without title, is good against all the world, except the owner of the true title. As against him it is otherwise. On a trial in such an action, the person establishing a legal title to the premises shall be presumed to have been possessed thereof within the time required by law, and the occupation of such premises by any other person shall be deemed to have been under and in subordination to the legal title; unless it appear that such premises have been held and possessed adversely to such legal title for twenty years before the commencement of such action. (*Code*, § 81.)

The defendant in this case claims that he was in possession, but makes no claim of right of possession of the premises until the date of the deed of Andrews, which was only eighteen years before the commencement of this action. His possession before his deed is to be presumed to be the possession of the true owner. After or at the date of the deed, only, can he claim to be holding adversely. This being short of twenty years, the plaintiff's title is oldest and best; unless by making this artificial stream to be the river, he can make his deed cover the land. The basis upon which this is claimed to be done, is the Frost map. Now, though such a man as Frost may have lived— may have been a surveyor—nay, had he even been present to have proved his identity, his qualifications, and the correctness of his survey and map, or even had he sworn that,

Marble *v.* McMinn.

in his opinion, this artificial slang or ditch was the river, the undoubted, the undisputed evidence that the natural river had maintained its bed and course for fifty years, and was still unchanged, would still, in law, bring the Frost description on the south side of the river. Maps and opinions cannot change such natural monuments. The Andrews deed description is on the *north* side of the river. The referee could only come to his conclusion by adopting what is called the Frost fancy description, and rejecting legal natural boundaries and monuments.

The premises in question, then, as a matter of fact, are not held by the defendants, under the Andrews deed; they are not described in it.

I think the referee is also in error, in holding that the plaintiff's deed, from James Harlow and wife, at the time it was executed and delivered, was and is void, and of no effect; and equally in error in holding that the plaintiff has no right to the possession of the said premises, and no right to maintain this action.

The plaintiff showed title to the premises, independent of the James Harlow deed. And having title, there is nothing in the statute or common law that prevents a party claiming title to lands from purchasing in outstanding claims of other persons to the same title, to quiet his own; and such deed, release, or quit-claim of title, is not void. It has the *effect*, at least, to quiet the claim of title of the person executing it. The taking of such a deed is not an acknowledgment that the grantor has no other title. The statute was enacted for no such purpose as that. The only questions in the case are questions of law; there is no dispute about facts.

The defendants, for the purpose either of showing title out of the plaintiff, or in themselves, put in evidence three deeds: 1st. A deed from Gerrit Smith to one David McMinn, dated November, 1843. They do not in any way connect themselves with this title. The character of

this deed is not given. The case informs us that the defendants got possession of it from the referee and refused to furnish it, or a copy of it. This, then, is a part of the evidence which it is to be presumed the referee passed upon, and which, by their act, this court cannot review. They cannot, therefore, take any benefit from this evidence. The plaintiff's original title was older than this, if it covers the premises; and even if it could be considered by us, it did not deprive the plaintiff of his older title from the same source. 2d. They introduced the deed under which they claim title, a deed of warranty from Philo Andrews to them, the defendants, dated June 10, 1851. The description is as follows: "All that certain piece or parcel of land situated in Davenport aforesaid, and bounded as follows: north by the Charlotte turnpike road, west by the west line of lot 39, in the Charlotte River Patent, between said turnpike and the south branch of the Charlotte river, on the south by the south stream of said river, easterly by a parallel line with the west line at sufficient distance from the same to contain two acres of land within said bounds."

There is no evidence to show that this description, containing but two acres, covers all, even if it covers any of the premises in dispute. The quantity claimed in the complaint is about three acres, described by monuments, which the maps No. 1 and B, given in evidence, show to contain 5 31-100ths acres. The Northern boundary of the land as described in this deed, the Charlotte turnpike road, as shown by the map, is far north of the main body of the Charlotte river. Bounded by this road north, west by the west line of lot 39; south by the south stream of this river, (wherever that may be,) and easterly by a parallel line with the west line, and at sufficient distance from the same to contain two acres, would include but the merest fraction of the disputed premises. Under this deed, even upon the theory of the referee, if the deed conveyed good title, the defendants were holding adversely to only

a fraction of the disputed land; not to the whole of it. 3d. The defendants introduced in evidence a deed from Philo Andrews to Edwin R. Brown, dated 10th December, 1851. The premises therein are described as follows: "Beginning at the mill floom on the Charlotte river, of James and Daniel McMinn's mill, thence down said mill-race on the east bank to the southwesterly corner of a lot of land owned and occupied by Simon Dibble, thence east on said Dibble's line across the turnpike road to the west line of a lot of land owned by Geo. Beers, thence north on said Beers' line to the most southwesterly corner of said Beers' lot, thence north 16d 30m west, 56c 75l to the east line of lands owned by James and Daniel McMinn, thence southerly on the line of lands owned by said McMinns to the center of the most southerly stream of the Charlotte river, thence up said river to the place of beginning, containing one hundred acres of land, more or less.

The said Philo Andrews always reserving all privileges on said premises which he has formerly conveyed to James and Daniel McMinn, and also reserving the use of said lands during his natural life."

This deed conveys no title to the defendants, nor can it convey away any from the plaintiff. We are furnished no map or other oral evidence to show what property it covers. One boundary in the deed seems to be the southerly stream of the Charlotte river. It may include the disputed premises; but the defendants claim that they had been previously conveyed to them. From the indefiniteness of this description, or rather from want of explanation, we are unable to give any importance to this deed. The burden of showing that this and other deeds introduced by them covered the premises, was upon them. They failed to do this, except by showing that an artificial ditch or slang was a river.

There was evidence in the case, of possession, and claim of possession of these premises, and of the quantities of

Marble *v.* McMinn.

water that ran at different times in the slang, of the over-
flowing by the river of the whole disputed lands, and of dec-
larations of parties affecting these questions, not necessary
to be considered.   We propose to consider only the ques-
tions of law.   The defendants subsequently introduced
another deed, containing a long description of lands, from
James Harlow to Alanson Harlow, but it is not followed
by any evidence showing its materiality, and it calls for no
remark.

·  The defendants, against the plaintiff's objections,·put in
evidence the field notes of a survey of lot No. 39, by James
Frost, and it was received by the referee.   These field
notes show that Frost adopted the south. stream of said
river as the boundary, and like field notes and survey of
los 40, which the case informs us were kept by the de-
fendants' attorney ;  that he refuses to furnish it, or a copy.
They also introduced field notes and survey claimed to
have been made by one Broadhead in 1804, but the same
is without any name of a surveyor, or a date.   This the
referee also received in evidence, against objection by the
plaintiff.   This also purports to bound along the southerly
stream.

The referee having erroneously received these docu-
ments in evidence, the judgment must be reversed, what-
ever else might be our view of the case.   They could not
be evidence.   No landholder would be safe if strangers
could make up surveys and maps, and, without proof of
their accuracy, or competence of the maker, they could be
used as evidence, to divest him of his estate.   The propo-
sition is too absurd to be seriously discussed.   The judg-
ment must be reversed, a new trial granted, costs to abide
the event, and the reference discharged.